*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0446p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

AUTO-OWNERS INSURANCE COMPANY,
                              *Plaintiff-Appellant,*

              *v.*

REDLAND INSURANCE COMPANY,
                              *Defendant-Appellee.*

No. 08-1023

_____

Appeal from the United States District Court

for the Western District of Michigan at Grand Rapids.

No. 06-00352—Robert J. Jonker, District Judge.

Argued: October 29, 2008

Decided and Filed: December 15, 2008

Before: BATCHELDER, CLAY and SUTTON, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Allen J. Philbrick, CONLIN, McKENNEY & PHILBRICK, P.C., Ann Arbor, Michigan, for Appellant. Laurence J. Rabinovich, SCHINDEL, FARMAN, LIPSIUS, GARDNER & RABINOVICH, LLP, New York, New York, for Appellee. **ON BRIEF:** Allen J. Philbrick, CONLIN, McKENNEY & PHILBRICK, P.C., Ann Arbor, Michigan, for Appellant. Laurence J. Rabinovich, SCHINDEL, FARMAN, LIPSIUS, GARDNER & RABINOVICH, LLP, New York, New York, David J. Bloss, BLOSS & BETZ, P.C., Grand Rapids, Michigan, for Appellee.

1

―――――――――――

**OPINION**

―――――――――――

SUTTON, Circuit Judge.   The question prompted by this insurance dispute is whether a driver of a tractor-trailer rig operates "in the business" of a motor carrier after he completes one delivery and, in anticipation of receiving another delivery order, begins to drive to find a place to sleep for the night—at which point a fatal car accident occurs.

I.

In March 2004, R&T Trucking leased a number of tractor-trailer rigs to Everhart Trucking.  The lease agreement required Everhart to maintain a "blanket policy of insurance . . . cover[ing] the usage of the insured vehicle[s] whi[le] engaging in the business of the carrier," but it provided that R&T would "pay for and maintain all other insurance coverage."  JA 29.  Everhart contracted with Auto-Owners to provide the required blanket insurance policy, and R&T secured a nontrucking liability policy, known as "bobtail" insurance, from Redland to cover the trucks when Everhart had not engaged them.

David Gale, an R&T employee, drove one of the trucks leased to Everhart.  On the morning of June 22, 2004, Everhart directed Gale to pick up a load of coiled steel in Zanesville, Ohio, and to deliver it to a manufacturer in Grand Rapids, Michigan.  Gale completed the delivery late that evening.  At 11:17 p.m., Gale called Everhart's main line, leaving a voice mail to the effect that he had finished his delivery, he was going to find a place to sleep and he would "probably wake up early and drive off some more to get [to] Gary—East of Chicago."  JA 90.  In the same message, he asked Everhart not to make his next appointment "real early."  *Id*.  Not long after he left this message, while driving west on I-196 South, Gale apparently fell asleep at the wheel and collided with another vehicle, killing the driver.

The victim's estate sued Gale, Everhart and R&T.  Claiming that the truck was not covered by its policy with R&T at the time of the accident, Redland denied coverage and refused to defend Gale and R&T.  The other carrier, Auto-Owners, tendered a defense, settled the suit for $1 million and obtained an assignment of claims from R&T and Everhart.

Invoking the diversity jurisdiction of the federal courts, Auto-Owners filed state-law claims against Redland, alleging that its policy covered the truck at the time of the accident and that Redland had breached its duty to defend. The district court granted summary judgment to Auto-Owners on the duty-to-defend claim but granted summary judgment to Redland on the coverage issue, concluding that the truck was being used "in the business" of the lessee at the time of the accident.

## II.

Auto-Owners' appeal presents just one issue: Was the truck being used "in the business" of Everhart Trucking when the accident occurred? The relevant language of the policy exclusion denies coverage when a covered vehicle is:

> [1.] [U]sed to transport goods or merchandise for any purpose, business or other, or while such goods or merchandise are being loaded or unloaded; or
>
> [2.] . . . [B]eing maintained or used . . . at the direction of, under the control of, under orders from, after being dispatched by, or *in the business of* any trucking company or lessee of such auto . . . ; or
>
> [3.] . . . [O]n a return trip to the place it is customarily garaged, or to a terminal or office of a party to whom it is rented, leased, or loaned, or to the home of the Named Insured, after having delivered goods or merchandise under direction, control, or dispatch to anyone other than the Named Insured under this policy . . . .

JA 160 (emphasis added).

The policy thus excludes coverage: (1) when a leased truck "transport[s]" goods from one location to another; (2) when those goods are being "loaded or unloaded" from the truck; (3) when the truck is on a "return trip" from a delivery; (4) when the truck has been "dispatched" to handle a job; or (5) when the truck is otherwise being used "in the business of" the lessee. As applied here, this policy undoubtedly would have excluded coverage during these stages of Gale's trip: (1) on the drive from Valley City, Ohio to Zanesville, Ohio, after he had been "dispatched" to pick up this load of steel coil; (2) on the drive from Zanesville to Grand Rapids, Michigan, while the truck "transport[ed]" these goods; and (3) during the "unload[ing]" of the steel coil at the Grand Rapids plant. Once Gale had

completed the Grand Rapids delivery, the exclusion also would have applied had Gale been in the midst of a "return trip" to Waynesfield, Ohio, his home base, at the time of the accident. And it would have applied had the accident occurred after Gale received an express "dispatch[]" from Everhart to proceed to Gary for a new pickup.

What happens, however, when the driver is involved in an accident while traveling in the direction of his next presumed, though not confirmed, dispatch and while he is on his way to finding a place to get some sleep? Is the truck being used "in the business" of a motor carrier at that point in time? Consistent with the district court's decision, we think that it is.

*First*, the "in the business" exclusion naturally covers Gale's use of the truck. He was not engaged in some frolic and detour, heading somewhere for his own purposes and no other. Having unloaded the goods at Grand Rapids after a long work day, he planned, as his last voice mail to Everhart indicates, to "go out here somewhere and go to sleep" and then "wake up early and drive off some more to get [to] Gary—East of Chicago." JA 90. Whether we choose to characterize the accident as occurring while Gale was driving somewhere to get some sleep (which, as it turns out, he tragically needed) or while heading in the direction of Gary, Indiana, Gale was operating "in the business" of Everhart Trucking. Both activities related to and directly served Everhart's commercial interests.

As for driving somewhere to get some sleep, federal regulations require truckers to spend a specific amount of time "off-duty" for every hour they spend driving. *See* 49 C.F.R. § 395.3. By the time Gale left the voice mail for Everhart, he had driven his load several hundred miles from Zanesville, Ohio to Grand Rapids, Michigan and had waited for several hours in Grand Rapids for his truck to be unloaded—hours that generally do not qualify as "off-duty" time. *See* 49 C.F.R. § 395.2. If Gale had not reached his driving limit by the time he unloaded the goods, he was undoubtedly close to it, and accordingly, with or without an express dispatch from Everhart, Gale could not have legally operated the truck for much longer without stopping to rest. Everhart's owner acknowledged that he would not have assigned Gale a new load until Gale had assured him that he had spent the required number of hours off-duty. Driving off "somewhere" to find a place to sleep, in other words, was a legal (as well as a practical) prerequisite for Gale to undertake another delivery, or at least

to be available to undertake another delivery, for Everhart the next day. Faced with the same question, this court and others have concluded that a driver is operating "in the business" of a carrier when he is driving to find a place to sleep for the night. *See, e.g.*, *Greenwell v. Boatwright*, 184 F.3d 490, 491–92 (6th Cir. 1999); *Mahaffey v. Gen. Sec. Ins. Co.*, 543 F.3d 738, 742–43 (5th Cir. 2008). Auto-Owners points to no decision to the contrary on this point.

As for treating the accident as occurring while Gale was heading toward Gary in anticipation of receiving an order the next morning, that too served the commercial interests of Everhart Trucking. Gale had a reasonable, justified expectation of securing a load in the "Gary—East of Chicago" area at some point the next day. *Cf. Mahaffey*, 543 F.3d at 743 (noting that a driver was operating in the business of a carrier when he "was driving to a motel to sleep with a reasonable expectation that a load would be available the following day"). The uncontradicted testimony of Everhart's owner justified that assumption: (1) "90 percent of the time" Everhart's "trucks reload[ed]" in the Gary area, JA 369, and (2) it was common for the driver making the delivery to the auto-parts manufacturer in Grand Rapids to proceed to the Gary area to pick up another load. *Cf. Hot Shot Express, Inc. v. Assicurazioni Generali, S.P.A.*, 556 S.E.2d 475, 478–79 (Ga. Ct. App. 2001). Just five days earlier, Gale had driven a similar route in eventually picking up a load in Gary. And Everhart later confirmed that it had intended to dispatch Gale for the trip. Because Gale knew that it was likely that he would be assigned a load in that area, he positioned the truck so he would be able to make any "appointment" arranged for him the next day, and he took steps to ensure that he would have the required hours of rest so that he would be qualified to pick up the newly assigned load. *See Lime City Mut. Ins. Ass'n v. Mullins*, 615 N.E.2d 305, 309–310 (Ohio Ct. App. 1992).

*Second*, the comprehensive nature of the other policy exclusions—applicable to trips transporting goods, to trips dispatched to pick up goods and to return trips—suggests that the catchall exclusion for other "in the business" activities of the trucker applies here. Where else would it apply and what else would it cover? Reasonably anticipating an order for the next day, positioning oneself for an order for the next day or getting some necessary sleep after a long day all serve the commercial interests of a motor carrier. But if they do not, it is hard to conceive what the "in the business" catchall covers.

Auto-Owners suggests that the catchall encompasses at least one activity not covered by the specific exclusions of its neighbors: driving to pick up an assigned load. That, however, is not the case. A provision of the same paragraph excludes coverage when a truck is used "at the direction of, under the control of, under orders from, [or] after being dispatched"—language that covers driving to pick up a load when directed to do so. All of this leaves the "in the business of" exclusion without a meaningful job to do—or at least not one that Auto-Owners has identified. Unless we wish to treat that provision of the paragraph as redundant or as serving no purpose, something we are loath to do, *Saunders v. Mortensen*, 801 N.E.2d 452, 455 (Ohio 2004), the provision naturally and fairly covers the very kind of activities Gale was engaged in at the time of the accident: positioning the truck in close proximity to the predicted location of the next pick-up and finding a place for the driver to rest and recharge his supply of on-duty hours for the next day.

Even if the "in the business" clause has independent effect, Auto-Owners adds, it must be read narrowly. In addition to the general rule that ambiguous policy provisions must be construed against the insurer, Ohio law requires us to interpret exclusions "as applying only to that which is clearly intended to be excluded." *Hybud Equip. Corp. v. Sphere Drake Ins. Co.*, 597 N.E.2d 1096, 1102 (Ohio 1992). But to establish a relevant ambiguity, a litigant must put forward a "plausible" competing interpretation of the phrase, *see Zirnhelt v. Mich. Consol. Gas Co.*, 526 F.3d 282, 287 (6th Cir. 2008), not just any interpretation. Yet Auto-Owners's proposed alternative interpretation—a driver is not operating "in the business" of a carrier unless he has actually been dispatched to pick up a load—is not a plausible construction of the phrase given that the exclusion elsewhere deals with "dispatch[ed]" truckers. There may be fact patterns, we realize, where it might be difficult to apply the "in the business" provision, but this is not one of them.

Auto-Owners separately argues that it is entitled to relief under Ohio's secondary-insurer contribution statute. *See* Ohio Rev. Code Ann. § 2307.34. But this argument fails for many of the same reasons that its not-in-the-business argument fails. Under certain circumstances, this statute allows a "primary" insurer (one that has issued a motor-vehicle policy to a motor *carrier*) to seek contribution from a "secondary" insurer (one that has issued a policy to the *owner* of the vehicle that the motor carrier has leased). *See id.* § 2307.34(B). But the primary insurer may recover only if the accident occurred "while the

operator [was] engaged in a nontrucking activity." *Id*. § 2307.34(B)(3). The only relevant definition of "nontrucking activity" covers "[a]ny operation of the leased motor vehicle that is *not for the benefit of the lessee*." *Id*. § 2307.34(A)(2)(a) (emphasis added). We see no reason to read "for the benefit" more narrowly than the "in the business" exclusion in the policy itself, and Auto-Owners has pointed us to no authority to the contrary. Because Gale's actions at the time of the accident were "for the benefit of" Everhart, they did not amount to "nontrucking activity."

Auto-Owners separately argues that all of this changes if we apply Michigan law, as opposed to Ohio law, to this case. Not true. What we have done thus far is apply the language of *this* exclusion to the undisputed facts of *this* case. The general principles of Michigan and Ohio law are the same when it comes to the resolution of this case. In Michigan, as in Ohio, "insurance policies are subject to the same contract construction principles that apply to any other species of contract." *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 26 (Mich. 2005); *see also Gomolka v. State Auto Mut. Ins. Co.*, 436 N.E.2d 1347, 1348 (Ohio 1982). "Ambiguous provisions in an insurance contract are construed against the insurer and in favor of coverage," *Heniser v. Frankenmuth Mut. Ins. Co.*, 534 N.W.2d 502, 504 (Mich. 1995); *see also City of Sharonville v. Am. Employers Ins. Co.*, 846 N.E.2d 833, 836 (Ohio 2006), but insurance-policy terms must also "be given their plain meaning and [a] court cannot create an ambiguity where none exists," *Heniser*, 534 N.W.2d at 505 (internal quotation marks omitted); *see also Hybud Equip. Corp.*, 597 N.E.2d at 1102. To determine whether language in an insurance policy is ambiguous with respect to a question of coverage, courts must ask whether a "fair reading of the entire contract of insurance," when applied to "particular circumstances," could lead reasonable minds to differ on the correct outcome. *Raska v. Farm Bureau Mut. Ins. Co.*, 314 N.W.2d 440, 441 (Mich. 1982); *see generally Gomolka*, 436 N.E.2d at 1347–51. As we have explained, when read in light of the "particular circumstances" of this case and in the context of the entire nontrucking endorsement, the "in the business" exclusion is not ambiguous.

Neither *Zurich-American Insurance Co. v. Amerisure Insurance Co.*, 547 N.W.2d 52 (Mich. Ct. App. 1996), nor *Engle v. Zurich-American Insurance Group*, 549 N.W.2d 589 (Mich Ct. App. 1999), points to a different conclusion. *Amerisure* held that a truck was not "being used in the business of" a carrier when an employee of the truck's owner drove the

truck to a repair facility to undergo repairs. *See* 547 N.W.2d at 56. The point of moving the truck in *Amerisure* was not to further the commercial interests of the carrier but to fix the truck consistent with an existing contractual duty to "keep the tractor in roadworthy condition and repair." *Id*. at 54 (internal quotation marks omitted). Indeed, "the tractor was not even attached to any trailer" at the time of the accident. *Id.* at 56. In contrast with today's case, the *Amerisure* driver thus was not between deliveries assigned by the carrier, was not positioning himself to pick up a future load, was not searching for a place to sleep to get his required hours of rest and had no reasonable expectation of securing a load in the area of the repair facility. So far as the opinion shows, moreover, *Amerisure* did not involve a policy containing numerous exclusions related to the work of a driver followed by a catchall "in the business" exclusion. The opinion thus makes it impossible to gauge any analogy between that case and this one—and specifically whether that policy, as here, contained specific exclusionary language that would render the "in the business" clause redundant if read too narrowly.

*Engle* involved a driver who used a truck to make various deliveries for a carrier in a single day. After making his last delivery and after stopping to eat dinner, the driver began the return trip to the carrier's office, when he was involved in an accident. At issue was an exclusion of coverage "[w]hile the automobile is being used in the business of any person or organization to whom the automobile is rented." *Engle*, 549 N.W.2d at 590 (alteration in original, internal quotation marks omitted). The court held that the "in the business" exclusion was ambiguous, construed it against the insurance company and awarded coverage as a matter of law to the insured. *Id.* at 591. The first signal that *Engle* does not govern this case is the reality that the exclusions at issue in today's case would have applied to the *Engle* driver's return trip. This policy, recall, contains a series of express exclusions, including one for "return trip[s]," together with a catchall "in the business" exclusion, making it quite different from a policy that, so far as the *Engle* opinion shows, contains only a general "in the business" exclusion.

The undisputed facts of this case also undermine Auto-Owners' reliance on *Engle.* There, the truck driver testified that, "after dropping off a trailer [at the last delivery point], he considered the day's work over." *Id.* at 484. Because the last delivery was a "one-way haul," the driver explained, he "never got paid a dime for going no place after he left [the last

delivery point]." *Id.* (internal quotation marks omitted). The only reason he chose to drive his truck back to the carrier's office after eating his dinner was because he "had no other place to park it." *Id.* He was under no obligation to return to the carrier's office, and the carrier allowed truckers to park their rigs at its office merely as a matter of convenience. *Id.* at 591. Here, Gale's actions were directly linked to Everhart's commercial interests. Gale was paid roughly $150 a day as long as the truck was available to pick up a load. Fresh off making one delivery for Everhart and reasonably expecting to receive a new assignment the next day, Gale was trying to find a place to sleep (so that he would be qualified to pick up the next day's load) and positioning himself to get to "Gary—East of Chicago" (where he reasonably expected his next pick-up would be). In the context of *this* insurance policy and on the undisputed facts of *this* case, the tractor-trailer rig was being "used . . . in the business" of Everhart Trucking at the time of the accident and thus was not covered by the Redland policy.

III.

For these reasons, we affirm.