CAROLINA CASUALTY INSURANCE
COMPANY, Plaintiff,

v.

PANTHER II TRANSPORTATION,
INC., et al., Defendants.

No. 1:08 CV 1380.

United States District Court,
N.D. Ohio,
Eastern Division.

Aug. 6, 2009.

Audrey E. Varwig, Patrick McCaffrey, Jr., Law Office of Philip F. Brown, Columbus, OH, for Plaintiff.

Braden K. Core, Timothy W. Wiseman, Scopelitis, Garvin, Light, Hanson & Feary, Indianapolis, IN, Robert M. Spira, Benesch, Friedlander, Coplan & Aronoff, Cleveland, OH, for Defendants.

### MEMORANDUM AND ORDER

KENNETH S. McHARGH, United States Magistrate Judge.

### I. FACTS AND BACKGROUND

This declaratory judgment action arises out of a motor vehicle accident. Most of the facts of this case are not in dispute. On December 2, 2007 at approximately 6:00 p.m., a Volvo straight truck driven by Michael Eades collided with a car operated by Ronald Runtas, causing bodily injury to Runtas. (*Doc. 2*, at ¶ 13; *doc. 9*, at ¶ 13; *doc. 11*, at ¶ 13).

Defendant Panther II Transportation, Inc. ("Panther") is a motor carrier engaged in the business of transporting property in interstate commerce. (*Doc. 25*, at ¶ 1). Defendant Zurich American Insurance Co. ("Zurich") issued to Panther an automobile liability policy, which was in effect from September 1, 2007 to September 1, 2008. (*Doc. 2*, at ¶ 9; *doc. 25*, at ¶ 2). Carolina Casualty issued to "PLO of Specified Independent Contractors of Panther II Transportation, Inc." a non-trucking liability policy, which was in effect from July 7, 2007 to July 7, 2008. (*Doc. 2*, at ¶ 8; *doc. 25*, at ¶ 3). Both policies were in effect at the time of the accident.

Panther does not own any of the vehicles used in its business but instead enters into agreements with independent contractor vehicle owners who lease their vehicles to Panther. (*Doc. 25*, at ¶ 15; doc. 25, *Exhibit A, Reymann Dep.*, at 33; doc. 25, *Exhibit B, St. Pierre Aff.*, at. ¶ 7). Work Horse Express, Inc. ("WHE") owns the Volvo straight truck Eades was driving at the time of the accident. (*Doc. 23*, at ¶ 3; doc. 2, at ¶ 11; *doc. 25*, at ¶¶ 6, 9). WHE is a Panther fleet operator and had leased the Volvo truck exclusively to Panther under a Contractor Operating Agreement for Straight Trucks and Cargo Vans. (*Doc. 23*, at ¶¶ 4–5; *doc. 25*, ¶¶ 3–4). The lease agreement, which was entered into on December 14, 2005 and in effect at the time of the accident, lists the Volvo straight truck on its Schedule of Equipment and Receipt as equipment leased to Panther by WHE. (*Doc. 2*, at ¶¶ 11–12; *doc. 25*, at ¶¶ 7, 11). The Volvo truck also appears on the scheduled vehicle list on the Carolina Casualty policy. (*Doc. 2*, at ¶ 8; *doc. 25*, at ¶ 8).

Panther often recruits drivers to be placed with vehicle owners. (*Doc. 25*, at ¶ 17). All drivers seeking placement must be "qualified" by Panther in order to operate vehicles that have been leased to Panther, a process which begins with a driver becoming "pre-qualified." *Id.* at ¶ 15. In order to become "pre-qualified," a prospective driver must meet applicable D.O.T. regulations. *Id.* at ¶ 22. A pre-qualified

driver's placement with a fleet operator is then contingent upon the driver's successful completion of a three-day orientation at Panther's headquarters. *Id.* at ¶ 24.

Eades was a prospective Panther driver. Approximately one week prior to the accident, Eades spoke with a Panther representative, Anna Reymann, about driving for Panther. (*Doc. 22, Eades Dep.,* at 10–11; doc. 25, *Exhibit A, Reymann Dep,* at 6). Reymann then obtained some background information from Eades; and determined that Eades was "pre-qualified" to drive for Panther. (Doc. 25, *Exhibit A, Reymann Dep,* at 9–18). Reymann then forwarded Eades' information to Lyn Brumfield, the owner of WHE. (*Doc. 22, Eades Dep.,* at 10–12). Brumfield arranged a meeting with Eades to discuss a possible working relationship. *Id.* at 11–12. At the meeting, Eades and Brumfield agreed that Eades would drive the Volvo straight truck that was leased to Panther, subject to Eades' completion of a three-day orientation at Panther's headquarters in Seville, Ohio. *Id.* at 12, 24. Brumfield thereafter faxed Reymann with information about their agreement, and Reymann contacted Eades with information regarding Panther's orientation. (*Doc. 26, Exhibit E, Transcript,* at 2). Eades was scheduled to begin orientation the day following the accident.

Brumfield agreed that Eades could drive the Volvo truck to orientation. Eades testified that he wanted to use the truck because it had a sleeping berth, which would allow him and his girlfriend to save money on lodging expenses. (*Doc. 22, Eades Dep.,* at 39). Both Reymann and Brumfield instructed Eades to cover Panther's logo and D.O.T. numbers before driving the truck. (*Doc. 24, brief in support,* at 3; *doc. 25,* at ¶¶ 47–48; *doc. 22, Eades Dep.,* at 9–10). Eades testified that he spent twenty to thirty minutes attempting to cover Panther's placards with cardboard and tape, but rainy weather conditions prevented the tape from sticking. (*Doc. 22, Eades Dep.,* at 27–29). Eades evidently decided to drive the truck anyway, and the Volvo truck indisputably displayed Panther's placards and D.O.T. numbers at the time of the accident. (*Doc. 22, Eades Dep.,* at 28–29; *doc. 22, Burger Dep.,* at 9).

Runtas made a claim to Panther for his injuries following the accident. Subsequently, Panther and Zurich made a demand to Carolina Casualty for coverage. (*Doc. 2,* at ¶¶ 16, 18; *doc., 9* at ¶¶ 16, 18; *doc. 11,* at ¶¶ 16, 18). Carolina Casualty denied coverage, *see* doc. 25, *Exhibit E, Letter,* and subsequently filed this declaratory judgment action seeking a determination as to which party is responsible for coverage for the accident. The parties cross-moved for summary judgment. For the reasons stated below, the Court GRANTS Defendants' motion for summary judgment and DENIES Plaintiff's motion for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the entire record "shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R.Civ.P. 56(c).* The moving party bears the burden of showing the absence of any such genuine issues of material facts; specifically

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the

absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is "material" only if its resolution might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has satisfied its burden of proof, the burden then shifts to the non-moving party pursuant to *Federal Rule of Civil Procedure 56(e),* which states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In ruling on a motion for summary judgment, the court must construe the evidence, as well as any inferences to be drawn from it, in the light most favorable to the party opposing the motion. *See Kraus v. Sobel Corrugated Containers, Inc.,* 915 F.2d 227, 229 (6th Cir.1990). The court also must determine "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. In reaching such a determination, however, the court is not to decide disputed questions of fact, but only to determine whether genuine issues of fact exist. *Id.* at 248–49, 106 S.Ct. 2505. Moreover, the "trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford &*

Co., 886 F.2d 1472, 1479–80 (6th Cir.1989) (citing *Frito-Lay Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C. Circuit 1988)).

The Supreme Court has held "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548

## III. ANALYSIS

### A. Whether Wyckoff Establishes that Panther and Zurich Have Primary Responsibility to Pay for Runtas' Injuries.

Plaintiff argues that the Ohio Supreme Court's decision in *Wyckoff Trucking, Inc. v. Marsh Bros. Trucking Serv., Inc.,* 58 Ohio St.3d 261, 569 N.E.2d 1049, 1054 (1991) dictates the outcome of this case. In *Wyckoff,* the Ohio Supreme Court held that the ICC regulations created an "irrebuttable presumption of an employment relationship between the carrier-lessee and the driver of a vehicle that displays the I.C.C. identification numbers of the carrier-lessee." The court further held that "[i]n order for liability to attach to an interstate carrier-lessee under I.C.C. regulations, it must be established that at the time the cause of action arose, (1) a lease of the vehicle was in effect and (2) the vehicle displayed the carrier lessee's placard listing its I.C.C. numbers." *Id.* According to the court, this bright-line rule assigning primary liability to the carrier-lessee in an action between it and the accident victim "removes the factual confusion attendant to determining which party is responsible for damages, thus relieving the innocent victim from the sometimes interminable delays that accompany multiple-party litigation ... and forcing the

trucking companies to allocate the various indemnification agreements among themselves." *Id.*

In this case, it is undisputed that a valid lease between WHE and Panther was in effect and that the Volvo truck displayed Panther's D.O.T. numbers at the time of the accident. (*Doc. 2,* at ¶¶ 12–13, 15; *doc. 9,* at ¶¶ 12–13; *doc. 11,* at ¶¶ 12–13; *doc. 26, brief in support,* at 2; *doc. 22, Eades Dep.,* at 8–9, 27–29). According to Plaintiff, these facts satisfy the two-pronged *Wyckoff* test, thereby creating an irrebuttable presumption that Eades was the statutory employee of Panther, operating the straight truck in the business of Panther at the time of the accident. (*Doc. 24, brief in support,* at 5; *doc. 31,* at 2–3). Plaintiff further argues that the irrebuttable presumption created under *Wyckoff* triggers the exclusion in the Carolina Casualty policy, which entitles Plaintiff to judgment in its favor. (*Doc. 24, brief in support, at 4–5; doc. 31,* at 3).

The Court agrees that in an action between Runtas—a member of the motoring public and the victim of this accident—and Panther—the carrier-lessee whose placards were displayed at the time of the accident—*Wyckoff* likely would operate to impose primary responsibility for coverage upon Panther. However, Runtas is not a party to this suit. Rather, the parties in this case are Panther and two insurers—Zurich, which issued an automobile policy to Panther, the company to which the truck was exclusively leased, and Carolina Casualty, which issued a "non-trucking" policy to WHE, the owner of the vehicle. The relevant questions, therefore, are what are the relative rights and responsibilities of the parties to *this* suit, and whether the court must use *Wyckoff* to determine those rights and responsibilities.

Ohio appellate courts following *Wyckoff* have split on the question of whether, in cases involving multiple insurers, the pre-

sumption of statutory employment established in *Wyckoff* also should dictate which insurer has primary responsibility for coverage. Some courts have held that *Wyckoff's* holding applies to such situations. In these cases, the courts have found that primary responsibility for coverage rests with the insurer of the entity whose placards were displayed on the vehicle at the time of the accident. *See e.g., Canal Ins. Co. v. Brogan,* 93 Ohio App.3d 765, 771, 639 N.E.2d 1219 (Ohio App. 10 Dist.1994) ("Initially, we note that, although *Wyckoff* emphasizes the benefit to the public from the scheme for determining liability espoused therein, *Wyckoff* is clearly also meant to settle issues of liability as to the carrier-lessee, the lessor, and their respective insurers."); *Ohio Cas. Ins. Co. v. United Southern Assur. Co.,* 85 Ohio App.3d 529, 533, 620 N.E.2d 163 (Ohio App. 2 Dist.1993) ("Notwithstanding that *Wyckoff* did not consider the issue of insurance coverage, the trial court concluded that the presumption would likewise apply to disputes between insurance companies. The court explained that 'logically the ICC Endorsement should create the same result when the dispute is between the insurer of the carrier-lessee and the insurer of the owner of the leased vehicle, namely that the insurer of the carrier-lessee provides coverage and a defense.' ").

Other courts, by contrast, have "limited *Wyckoff* to its literal application as between the innocent victim and an interstate carrier-lessee whose I.C.C. number appears on the vehicle." These courts have reasoned that a narrow reading of *Wyckoff*—i.e., that *Wyckoff's* holding only applies as between the victim and the carrier-lessee—is appropriate "because *Wyckoff* itself indicates that the statutory employer may seek contribution and/or indemnification from other potentially responsible parties," and because *Wyckoff* does not "nullify contracts between parties

who are not members of the protected class and who are in a position to determine the relationships among the parties." *See Diamond State Ins. Co. v. Ranger Ins. Co.,* 47 F.Supp.2d 579, 590 (E.D.Pa. 1999) (citing *Gilstorff v. Top Line Express, Inc.,* 106 F.3d 400, 1997 WL 14378, at *3 (6th Cir. Jan. 14, 1997;) *Tolliver v. Braden,* 112 Ohio App.3d 86, 677 N.E.2d 1249, 1250 (Ohio App. 1 Dist.1996;) *Harco Nat'l Ins. Co. v. America Inter–Fidelity, Inc.,* 1994 WL 530834, at *2 (Ohio App. 6 Dist. Sept. 30, 1994;) *Balez–Pierce v. Price and Boyce, Inc.,* 86 Ohio App.3d 119, 619 N.E.2d 1194, 1196 (Ohio App. 5 Dist.1993;) *Roseberry v. Balboa Ins. Co.,* 90 Ohio App.3d 33, 627 N.E.2d 1062, 1064–65 (Ohio App. 12 Dist.1993;) *Lime City Mut. Ins. Ass'n v. Mullins,* 83 Ohio App.3d 517, 615 N.E.2d 305, 308–09 (Ohio App. 6 Dist. 1992)).

■ In the absence of an affirmative statement from the Ohio Supreme Court resolving this issue, the Court must predict whether the Ohio Supreme Court would apply *Wyckoff* in this case to establish that Panther and its insurer, Zurich, have primary responsibility to pay for Runtas' injuries. *See Stanek v. Greco,* 323 F.3d 476, 478 (6th Cir.2003) ("If the forum state's highest court has not addressed the issue, the federal court must ascertain from all available data, including the decisional law of the state's lower courts, what the state's highest court would decide if faced with the issue."). The Court predicts that were the Ohio Supreme Court faced with this issue today, it would not extend the holding of *Wyckoff* to settle coverage disputes such as the one at bar. First, as Defendants note, the *Wyckoff* court explicitly left this issue for another day. Insurers were among the parties in *Wyckoff,* and had the court in that case wanted to apply its holding to allocate responsibility among them, it could have done so. Instead, the court remanded the case for a determination as to the parties'

relative rights to contribution and indemnification. *Wyckoff,* 58 Ohio St.3d 261, 569 N.E.2d at 1054, n. 2. Moreover, as stated in *Roseberry,* 90 Ohio App.3d 33, 627 N.E.2d at 1064–65, "the presumption of employment was intended to relieve the burden of "the innocent victim" in identifying the properly responsible party." It was not meant to relieve wholesale from responsibility the owner of the vehicle or his insurer "who [are] in a better position to determine the relationships among the various parties to the lease and to determine who is potentially liable." *Id.* Nor was the purpose of *Wyckoff* to "broadly sweep aside principles of common law and the parties' own contracts in resolving questions of coverage concerning multiple insurers." *Diamond State,* 47 F.Supp.2d at 590. Carolina Casualty simply is not a member of the protected class with which *Wyckoff* was concerned. Thus, the Court finds that *Wyckoff* does not dictate which party in this case is responsible for this accident.

### B. Which Policy Provides Coverage for the Accident.

Having determined that *Wyckoff* does not dictate the relative responsibilities between the parties in this case, the Court now turns to the question of which insurance policy provides coverage for this accident. As an initial matter, the Court finds that the Carolina Casualty policy is primary. The "Other Insurance" section of the Carolina Casualty policy provides in relevant part: "[f]or any covered 'auto' you own, this Coverage Form provides primary insurance." (*Doc. 24, Exhibit G, Policy,* at 25). WHE is the insured under the Carolina Casualty policy and owns the Volvo truck that was involved in this accident. (*Doc. 23,* at ¶ 3; *doc. 2,* at ¶¶ 8, 11; *doc. 25,* at ¶¶ 3, 6, 9). Carolina Casualty does not specifically argue that its policy is not primary; rather, Carolina Casualty ar-

gues, as explained more thoroughly below, that an exclusion contained within its policy bars coverage. (*Doc. 24, brief in support,* at 4; *doc. 31,* at 3). Implicit in Carolina Casualty's argument is an acknowledgment that the Court must look to its policy first. Thus, the Court finds that the Carolina Casualty policy provides primary insurance coverage for the Volvo truck and will apply to cover the accident in question unless an exclusion to that policy bars coverage.

Carolina Casualty argues that the language found in its policy's Non–Trucking Use Endorsement excludes coverage. The Non–Trucking Use Endorsement provision states in relevant part:

This insurance does not apply:

(a) While the covered 'auto' is used to carry property in any business; or

(b) While the covered 'auto' is used under the direction, control, dispatch of any person or organization, other than the Named Insured shown in the Declarations, engaged in any business; or

(c) While the covered 'auto' is used in the business of any person or organization to whom the covered 'auto' is rented, leased, or loaned; or

(d) While the covered 'auto' is under dispatch for any service, repair, or maintenance required to be performed by any business of any person or organization other than the Named Insured shown in the Declarations; or

(e) While the covered 'auto' is returning from a delivery made in the business of any person or organization; or

(f) While the covered 'auto' is en route to be used in the business of any person or organization.

(*Doc. 24, Exhibit G, Policy,* at 38). Plaintiff argues that subsections (c) and (f) apply because Eades was using the Volvo truck "in the business of" Panther and/or was en route to use the truck "in the business of" Panther at the time of the accident. (*Doc. 24, brief in support,* at 4).

■ As both parties note, the Carolina Casualty policy does not define the phrase "in the business of." Where terms used in insurance contracts are undefined, a court must give the terms "their plain and ordinary meaning." *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm,* 73 Ohio St.3d 107, 652 N.E.2d 684, 686 (1995) (citing *Miller v. Marrocco,* 28 Ohio St.3d 438, 504 N.E.2d 67 (1986)). Neither party argues that the phrase is ambiguous, and this court has found no authority so suggesting. Several courts have interpreted the phrase "in the business of" to mean "used to further the commercial interests of the lessee." *See e.g., Lime City Mut. Ins. Assn. v. Mullins,* 83 Ohio App.3d 517, 615 N.E.2d 305, 308 (Ohio App. 6 Dist. 1992). Thus, in order for either subsection (c) or (f) to apply in this case, Eades must have been using the truck "to further the commercial interests of" Panther at the time of the accident.

■ Plaintiff argues that Eades was using the Volvo truck to "further the commercial interests of" Panther at the time of the accident for two reasons. First, Plaintiff claims that by transporting the truck to Panther's facility in Seville, Ohio, Eades "relocated the truck for Panther." (*Doc. 24, brief in support,* at 10). Specifically, Plaintiff claims that Eades "delivered the truck to a location designated by Panther" and "ma[de] the truck available for dispatch, which in turn would allow Panther to fulfill its contractual obligations with its customers by transporting goods." *Id.* at 10–11. Plaintiff also appears to claim that Panther asked him to drive the truck. *Id.* at 10.

Second, Plaintiff points to the purported fact that "Eades was en route to a Panther

orientation" while driving the Volvo truck. *Id.* Plaintiff argues that Eades' journey to the orientation benefitted Panther because "[h]is orientation was a prerequisite to serve Panther" and would have "allowed him to provide services to Panther as a driver." *Id.* According to Plaintiff, since Panther "needs trained drivers available to carry out its work ... Eades['] attendance at orientation does commercially benefit Panther because it adds another driver or potential driver to its fleet to carry out Panther's business." (*Doc. 31*, at 4).

As Defendant notes in response to Plaintiff's first argument, Plaintiff presents no evidence that Panther affirmatively asked Eades to drive the truck or that Panther wanted the truck relocated to the Seville, Ohio location. *See doc. 29*, at 5. Plaintiff's claim that Eades was furthering the commercial interests of Panther because Panther specifically wanted Eades to move the truck or to make the truck available for dispatch, therefore, is based on mere speculation. Such speculation does not constitute evidence sufficient to support a motion for summary judgment. *See Creiglow v. U.S.*, 113 F.3d 1234 (Table), 1997 WL 225498 at *2 (6th Cir. May 1, 1997) (stating that a plaintiff must offer "concrete evidence, and not mere assertions, from which a reasonable jury could find in [his] favor" in support of his motion for summary judgment) (internal citations and quotation marks omitted). Thus, the Court finds no merit to Plaintiff's first argument.

■ As to Plaintiff's second argument, Defendants make two points in response. First, Defendants take issue with Plaintiff's assertion that Eades was "en route to orientation" at the time of the accident. Defendants argue that, in fact, Eades was not scheduled to attend orientation until the following morning and that at the time of the accident Eades was on his way to a truck stop where he could park and sleep

for the night. (*Doc. 29*, at 6). Thus, according to Defendants, Eades was not "en route to orientation" at the time of the accident.

Second, Defendants appear to argue that whether or not Eades was "en route to orientation" at the time of the accident is of no consequence because Eades' attendance at orientation does not commercially benefit Panther. *See doc. 26, brief in support*, at 7–8. Defendants claim that "Panther is indifferent as to whether certain drivers ultimately go on to work for its fleet operators[ ] like WHE" and only requires its drivers to complete a three-day orientation in order "to ensure compliance with federal and state regulations, not to gain any benefit from the prospective drivers. *Id.* at 7. "For this reason, [argue Defendants], Panther does not pay or reimburse prospective drivers for travel to or accommodations during orientation, including Eades." *Id.* Defendants further note that Eades was neither under dispatch for Panther, nor en route to pick up a load for Panther, nor returning home from delivering a load at the time of the accident. In fact, Eades had not even been hired by Panther at the time of the accident. Thus, Eades' journey to orientation was not "in the business of" Panther.

The Court agrees with Defendants that Eades' journey to orientation in the truck was of too remote a benefit to Panther to be in furtherance of Panther's commercial interests. As Plaintiff itself notes, Eades "did not need the truck for orientation" and "had other means to travel to the orientation." (*Doc. 24, brief in support*, at 10). Eades wanted to use the truck because it allowed him and his girlfriend to avoid incurring lodging expenses. (*Doc. 22, Eades Dep.*, at 39). Moreover, Eades' attendance at orientation would have benefitted Panther in only a tenuous way. There was no guarantee that Eades even

would have completed orientation, and his failure to do so would have prevented him—and in this case did prevent him—from driving trucks leased to Panther in the regular course of Panther's business. Plaintiff argues that if Eades had in fact completed orientation, it would have commercially benefitted Panther by adding "another driver or potential driver to its fleet to carry out Panther's business," *see* *doc. 31*, at 4, but Plaintiff has failed to present any evidence that Panther had any particular interest in whether or not *Eades* completed orientation or that Panther even wanted or needed more drivers on the road. In short, Plaintiff has failed to show how Eades' use of the truck in this case was sufficiently in furtherance of Panther's business to place that use within the scope of the Carolina Casualty policy exclusion.[1]

Thus, whether or not Eades technically was "en route to orientation" at the time of the accident is of no moment; even assuming Eades was "en route to orientation," his use of the truck still was not in "in the business of" Panther. Accordingly, the Court finds that Plaintiff has failed to establish that Eades' use of the truck satisfies either subsection (c) or (f) of the Non-Trucking Use Endorsement contained within its policy. Because Plaintiff has not shown that any of the relevant provisions of its policy exclusions apply in this case, the Court finds that Plaintiff is primarily responsible for coverage of the Runtas accident.

### C. Whether Defendants May Seek Contribution from Plaintiff Under O.R.C. § 2307.34(B).

Defendants also argue that even if the Court finds them primarily responsible for

coverage for the Runtas accident under *Wyckoff*, Ohio Revised Code § 2307.34(B) allows them to seek contribution from Plaintiff. (*Doc 26, brief in the support*, at 13–15; *doc. 29*, at 10–13).

*Ohio Revised Code § 2307.34(B)* allows the insurer of a carrier-lessee to seek contribution from the insurer of a vehicle owner when the operator of the vehicle was engaged in "nontrucking" activity at the time of the accident. "Nontrucking activity" is defined as any of the following:

(a) Any operation of the leased motor vehicle that is not for the benefit of the lessee;

(b) Any operation of the leased motor vehicle by anyone other than an operator who previously has been qualified and authorized by the lessee or authorized agents of the lessee to operate the vehicle;

(c) Any operation of the leased motor vehicle for the purpose of conducting any personal or business affairs of the vehicle owner or his agents or employees, if the operation results in a diversion of the vehicle, while transporting property for the lessee, from its normal or reasonable route between its point of origin and point of destination and all scheduled pickup or delivery stops en route thereto;

(d) Any operation of the leased vehicle by any person to transport property without the prior knowledge and consent of the lessee.

*Id.* at § 2307.34(A)(2). Thus, contribution is available under the statute if any of the above definitions of nontrucking activity are met.

---

1. The Court also finds it highly significant that both Brumfield, the truck's owner, and Reymann, a Panther recruiter, told Eades to cover Panther's placards and D.O.T. numbers prior to operating the truck. The fact that this instruction came from both the truck's owner and its lessee reflects both WHE's and Panther's desire that the Volvo truck not be—or appear to be—a "Panther truck" during Eades' drive to Seville, Ohio.

■ Plaintiff argues that contribution is unavailable to Defendants in this case because Eades' operation of the truck does not meet any of the definitions of non-trucking activity. (*Doc. 24, brief in support*, at 8; *doc. 27*, at 7). First, Plaintiff claims that Eades' operation of the truck does not meet definition (a) because Eades was driving "for the benefit of" Panther. (*Doc. 24, brief in support*, at 9–11; *doc. 27*, at 7–8). Plaintiff's arguments in support of this claim are nearly identical to those it makes in support of its claim that Eades was using the truck to "further the commercial interests of" Panther within the meaning of its policy exclusion. *See doc. 24, brief in support*, at 5, 8, 9–11; *doc. 27*, at 3–4. Second, Plaintiff argues that Eades' operation of the truck does not meet the definition (b) because Eades was a qualified driver under federal regulations and because Panther had "authorized" and "pre-approved" Eades to drive the truck. (*Doc. 24, brief in support*, at 11–14; *doc. 27*, at 8–9). It is undisputed that Eades' operation of the truck does not meet definitions (c) and (d). *See doc. 24, brief in support*, at 14; *doc. 26, brief in support*, at 14.

Because the Court does not find that Defendants are responsible for coverage either under *Wyckoff* or by way of the relevant insurance policies, the question of whether Defendants may seek contribution under *O.R.C. § 2307.34(B)* is moot. Accordingly, *O.R.C. § 2307.34(B)* does not alter in any way the relative responsibilities between the parties, and the Court finds that Plaintiff is solely responsible for coverage for the Runtas accident.[2]

## IV. CONCLUSION

For the reasons set forth above, the Court DENIES Plaintiff's motion for summary judgment (*doc. 24*), and GRANTS Defendants' motion for summary judgment (*doc. 26*).

IT IS SO ORDERED.

---

**2.** However, the Court notes that contribution would be available to Defendants in any case because Eades' operation of the truck in this case meets at least one of the definitions of "non-trucking activity" outlined above. For example, Eades' operation of the truck meets definition (a) because he was not driving the truck "for the benefit of the lessee." This is so for similar reasons that Eades was not "furthering the commercial interests" of Panther by driving the truck. The Court sees no reason to read one of these phrases more or less narrowly than the other, and Plaintiff does not appear to dispute that the phrases are more or less congruent to one another. *See* doc. 24, at 10 (citing *Auto–Owners Ins. Co. v. Redland Ins. Co.*, 549 F.3d 1043, 1047 (6th Cir.2008) for the proposition that the phrase "for the benefit" of should not be read more narrowly than the phrase "in the business of"). Thus, even if *O.R.C. § 2307.34* were at issue, Plaintiff's argument that contribution is unavailable to Defendants would fail.